# EXHIBIT 6

In re Cavanaugh, 306 F.3d 726 (2002)

Fed. Sec. L. Rep. P 91,978, 53 Fed.R.Serv.3d 763, 02 Cal. Daily Op. Serv. 9485...

KeyCite Yellow Flag - Negative Treatment
Distinguished by In re Extreme Networks Inc. Securities Litigation, N.D.Cal., June 28, 2016

306 F.3d 726
United States Court of Appeals,
Ninth Circuit.

In re David CAVANAUGH; In re Michael Hannon;
In re Richard Weiss; In re Raymond Pfeifer; In re
Robert Herrgott,
David Cavanaugh; Michael Hannon; Richard
Weiss; Raymond Pfeifer; Robert Herrgott,
Petitioners,
v.
United States District Court for the Northern
District of California, Respondent,
Quinn Barton, Real Party in Interest.

No. 01-70772.
|
Argued and Submitted Feb. 15, 2002.
|
Filed Sept. 16, 2002.

Following decision by the United States District Court for the Northern District of California, naming lead plaintiff in securities fraud class action, group of shareholders not selected filed petition for writ of mandamus. The Court of Appeals, Kozinski, Circuit Judge, held that selection of lead plaintiff did not comply with requirements of Private Securities Litigation Reform Act (PSLRA).

Writ granted.

Wallace, Circuit Judge, filed concurring opinion.

West Headnotes (7)

[1]     **Mandamus**
         🔑 Parties Plaintiff or Petitioners

         Consideration of District Court's order naming lead plaintiff in securities fraud action was appropriate on petition for writ of mandamus, as order raised new and important problems and issues of first impression regarding district court's authority to select a lead plaintiff under the Private Securities Litigation Reform Act

(PSLRA). Securities Exchange Act of 1934, § 21D, as amended, 15 U.S.C.A. § 78u-4.

6 Cases that cite this headnote

[2]     **Federal Civil Procedure**
         🔑 Stockholders, Investors, and Depositors

         District court's decision in securities fraud class action, after determining that group of five shareholders had largest financial stake in the litigation, naming a different shareholder as lead plaintiff did not comply with requirements of Private Securities Litigation Reform Act (PSLRA); shareholders with largest financial stake were presumptively most capable lead plaintiffs under the Act, and court based its decision on improper consideration of which prospective lead plaintiff had the most advantageous fee arrangement with its lawyers. Securities Exchange Act of 1934, § 21D, as amended, 15 U.S.C.A. § 78u-4.

115 Cases that cite this headnote

[3]     **Federal Civil Procedure**
         🔑 Stockholders, Investors, and Depositors

         Private Securities Litigation Reform Act (PSLRA) did not raise standard adequacy threshold for lead plaintiff required for class action certification, and left standards of class certification rule intact. Securities Exchange Act of 1934, § 21D, as amended, 15 U.S.C.A. § 78u-4; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

7 Cases that cite this headnote

[4]     **Federal Civil Procedure**
         🔑 Stockholders, Investors, and Depositors

         Information regarding attorney fee schedule is

In re Cavanaugh, 306 F.3d 726 (2002)

Fed. Sec. L. Rep. P 91,978, 53 Fed.R.Serv.3d 763, 02 Cal. Daily Op. Serv. 9485...

relevant, for purposes of selecting lead plaintiff for securities fraud class action under Private Securities Litigation Reform Act (PSLRA), only to determine whether presumptive lead plaintiff's choice of counsel is so irrational, or so tainted by self-dealing or conflict of interest, as to cast genuine and serious doubt on that plaintiff's willingness or ability to perform the functions of lead plaintiff. Securities Exchange Act of 1934, § 21D, as amended, 15 U.S.C.A. § 78u-4; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

61 Cases that cite this headnote

[5]    **Federal Civil Procedure**
👉Stockholders, Investors, and Depositors

If the presumptive lead plaintiff in securities fraud class action under Private Securities Litigation Reform Act (PSLRA) has selected as counsel a family member or a lawyer who has a conflict of interest, court's adequacy inquiry is not into the adequacy or fitness of counsel, but into the adequacy of plaintiff; choice of counsel is only an indicator of lead plaintiff's fitness. Securities Exchange Act of 1934, § 21D, as amended, 15 U.S.C.A. § 78u-4.

89 Cases that cite this headnote

[6]    **Federal Civil Procedure**
👉Stockholders, Investors, and Depositors

That another prospective lead plaintiff in a securities fraud class action, other than the presumptive lead plaintiff under the Private Securities Litigation Reform Act (PSLRA), has chosen counsel more wisely or parsimoniously in the district court's view will not support a finding that the presumptive lead plaintiff is inadequate to serve in that position. Securities Exchange Act of 1934, § 21D, as amended, 15 U.S.C.A. § 78u-4.

71 Cases that cite this headnote

[7]    **Federal Civil Procedure**
👉Stockholders, Investors, and Depositors

Auction to select class counsel in a securities fraud class action is not generally permissible under the Private Securities Litigation Reform Act (PSLRA). Securities Exchange Act of 1934, § 21D, as amended, 15 U.S.C.A. § 78u-4.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*727** Patrick J. Coughlin of Milberg Weiss Bershad Hynes & Lerach LLP for the petitioners. Sanford Svetcov, Randi D. Bandman, Lesley E. Weaver, Eric A. Isaacson and Frederick B. Burnside, all of Milberg Weiss Bershad Hynes & Lerach LLP, along with David R. Scott and James E. Miller, Scott & Scott, LLC, joined him on the brief.

Daniel A. Osborn of Beatie and Osborn LLP argued for the real party in interest Quinn Barton.

The Honorable Vaughn R. Walker, United States District Judge for the Northern District of California, submitted a pro se brief. Professor Elliott J. Weiss of the James E. Rogers College of Law at the University of Arizona argued on Judge Walker's behalf.

Luis de la Torre of the Securities and Exchange Commission argued as an amicus curiae supporting real party in interest Quinn Barton. David M. Becker, Meyer Eisenberg, Jacob H. Stillman and Eric Summergrad joined him on the brief.

Professor Joseph A. Grundfest of Stanford Law School filed an amicus curiae brief supporting the respondent on behalf of the California Public Employees' Retirement System and Barclays Global Investors, N.A. James Finberg and Melanie M. Piech of Lieff, Cabraser, Heimann & Bernstein, LLP joined him on the brief.

On Petition for Writ of Mandamus to the United States District Court for the Northern District of California, Vaughn R. Walker, District Judge, Presiding. D.C. No. CV-00-03894-VRW.

Before WALLACE, KOZINSKI and PAEZ, Circuit

In re Cavanaugh, 306 F.3d 726 (2002)

Fed. Sec. L. Rep. P 91,978, 53 Fed.R.Serv.3d 763, 02 Cal. Daily Op. Serv. 9485...

Judges.

**OPINION**

KOZINSKI, Circuit Judge.

On this petition for a writ of mandamus, we consider the authority of the district court to select a lead plaintiff under the Private Securities Litigation Reform Act ("Reform Act"), 15 U.S.C. § 78u-4.

**Facts and Procedural Background**

The share price of Copper Mountain Networks, Inc., a Palo Alto supplier of **\*728** Digital Subscriber Line (DSL) products, fell from $125 to less than $10 in the fourth quarter of 2000. Its most dramatic plunge occurred immediately after management announced that fourth-quarter revenue and earnings per share would, contrary to earlier predictions, decline. Lawsuits followed swiftly. Different plaintiffs filed over twenty separate class action complaints in the Northern District of California, alleging securities fraud by the same defendants over essentially the same period.

The district court announced plans to consolidate the lawsuits and to appoint a lead plaintiff. To this end, it scheduled a case management conference and ordered each plaintiff interested in serving as lead to answer questions about his knowledge of the case, the extent of his negotiations with law firms and his ability to monitor his counsel's performance. *See In re Quintus Sec. Litig.,* 201 F.R.D. 475, 492-93 (N.D.Cal.2001) (hereinafter, *Quintus I* ) (listing the questions). Only three candidates submitted answers to the district court's questions: William A. Chenoweth, an accountant; Quinn Barton, a self-employed investor; and five businessmen (the "Cavanaugh group"). Each member of the Cavanaugh group claimed to have lost more money on Copper Mountain stock than the other two candidates combined.[1]

---

[1] The Cavanaugh group claimed total damages of $3,327,000, broken down as follows: David Cavanaugh, $943,000; Michael P. Hannon, $765,000; Richard Weiss, $633,000; Raymond Pfeifer, $524,000; Robert A. Herrgott, $462,000.

Quinn Barton did not declare his damages, but counsel for the Cavanaugh group estimated them at $59,000. William Chenoweth estimated his damages to be approximately $295,000.

At the case management hearing, the district court interviewed the candidates about their business experience, their knowledge of the lawsuit, how they came to choose their attorneys and particularly about their fee agreements with counsel. The Cavanaugh group had hired Milberg Weiss Bershad Hynes & Lerach ("Milberg Weiss"), a well-known plaintiffs' securities litigation firm, pursuant to a fee agreement under which Milberg Weiss would take a percentage of the total recovery. The percentage increased with the size of recovery, topping out at a marginal rate of 30 percent. *See id.* at 480. Barton had hired Beatie and Osborn LLP, a small New York law firm, under a fee agreement that allowed for between 10 percent and 15 percent of recovery, with an $8 million cap. *See id.* at 479. The third candidate, Chenoweth, had not hired an attorney, explaining that "he will undertake such negotiations [with counsel] after he is appointed lead plaintiff. Chenoweth said that he believes that he would have more leverage in these negotiations after being designated lead plaintiff than before." *Id.*

Purporting to apply the Reform Act, the district court found that the Cavanaugh group was the presumptively "most adequate plaintiff" because it had the largest stake in the controversy, but concluded that Barton had rebutted that presumption by showing "significant differences in potential attorney fees" that "cannot be rationally explained by intangible factors such as the well-recognized brand name in securities litigation of [the Cavanaugh group's] counsel." *Id.* at 488. The district court disqualified Chenoweth from consideration because he had not selected a lawyer, and appointed Barton as lead plaintiff.

[1] The Cavanaugh group petitioned for a writ of mandamus, arguing that it should have been appointed lead plaintiff. Because "[t]he district court's order raises new and important problems, [and] issues **\*729** of law of first impression," we conclude that it is appropriate to consider the issues at this time. *Bauman v. United States Dist. Court,* 557 F.2d 650, 655 (9th Cir.1977).

In re Cavanaugh, 306 F.3d 726 (2002)

Fed. Sec. L. Rep. P 91,978, 53 Fed.R.Serv.3d 763, 02 Cal. Daily Op. Serv. 9485...

**Discussion**

**I**

We start, as always, with the language of the applicable statute, in this case 15 U.S.C. § 78u-4(a). While this section contains a number of requirements, it is neither overly complex nor ambiguous; we need be neither Talmudic scholars nor skilled in the use of Urim and Thummin to construe it. *See Wilson Arlington Co. v. Prudential Ins. Co.,* 912 F.2d 366, 371 (9th Cir.1990) ("The test for ambiguity is not complexity, but lack of clarity."). A straightforward reading of the statutory language discloses a clear path that the district court must follow in selecting the lead plaintiff.

Under prior law, lead plaintiffs in securities litigation cases were often selected by a race to the courthouse; the first plaintiff to file suit was usually appointed as class representative under Rule 23 of the Federal Rules of Civil Procedure. *See In re Cendant Corp. Litig.,* 264 F.3d 201, 255 (3d Cir.2001), *cert. denied,* 535 U.S. 929, 122 S.Ct. 1300, 152 L.Ed.2d 212 (2002). Dissatisfied with this mechanism for selecting the lead plaintiff, and with various other aspects of securities class action litigation, Congress passed the Reform Act in 1995. The Act instructs district courts to select as lead plaintiff the one "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). While the words "most capable" seem to suggest that the district court will engage in a wide-ranging comparison to determine which plaintiff is best suited to represent the class, the statute defines the term much more narrowly: The "most capable" plaintiff-and hence the lead plaintiff-is the one who has the greatest financial stake in the outcome of the case, so long as he meets the requirements of Rule 23.[2]

[2] The mechanism used by the Reform Act to achieve this purpose is somewhat unusual but, nonetheless, quite clear. The Act sets up a rebuttable presumption that the plaintiff with the largest stake in the controversy will be the lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii). That the presumption is rebuttable does not mean that it may be set aside for any reason that the court may deem sufficient. Rather, the statute provides that the presumption "may be rebutted only upon proof ... that the presumptively most adequate plaintiff" does not satisfy the adequacy or typicality requirements of Rule 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). This was the method of selecting the lead plaintiff suggested by Professors Weiss and Beckerman. *See* Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions,* 104 Yale L.J. 2053, 2105-08 (1995). As the Third Circuit recognized, the Reform Act closely followed the recommendations in this article. *See Cendant,* 264 F.3d at 261-62.

The Reform Act provides a simple three-step process for identifying the lead plaintiff pursuant to these criteria. The first step consists of publicizing the pendency of the action, the claims made and the purported class period. 15 U.S.C. § 78u-4(a)(3)(A). The first plaintiff to file an action covered by the Reform Act must post this notice "in a widely circulated national business-oriented publication or wire service." 15 U.S.C. § 78u-4(a)(3)(A)(i). The notice must also state that "any member of the purported class may move the court to serve as lead plaintiff." 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).

In step two, the district court must consider the losses allegedly suffered by the various plaintiffs before selecting as the **\*730** "presumptively most adequate plaintiff"[3]-and hence the presumptive lead plaintiff-the one who "has the largest financial interest in the relief sought by the class" and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). In other words, the district court must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit.[4] It must then focus its attention on *that* plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of "typicality" and "adequacy."[5] If the plaintiff with the largest financial stake in the controversy provides information that satisfies these requirements, he becomes the presumptively most adequate plaintiff. If the plaintiff with the greatest financial stake does not satisfy the Rule 23(a) criteria, the

Fed. Sec. L. Rep. P 91,978, 53 Fed.R.Serv.3d 763, 02 Cal. Daily Op. Serv. 9485...

court must repeat the inquiry, this time considering the plaintiff with the next-largest financial stake, until it finds a plaintiff who is both willing to serve and satisfies the requirements of Rule 23.

3    The Reform Act uses "most adequate plaintiff" as a synonym for "most capable of adequately representing the interests of class members." *See* 15 U.S.C. § 78u-4(a)(3)(B)(i).

4    To make this comparison, the district court must calculate each potential lead plaintiff's financial interest in the litigation. In so doing, the court may select accounting methods that are both rational and consistently applied. Because the calculation is not in dispute here, we need not decide the scope of the district court's discretion in determining which plaintiff has the greatest financial interest in the litigation.

5    Rule 23(a) provides that:
    One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are *typical* of the claims or defenses of the class, and (4) the representative parties will *fairly and adequately* protect the interests of the class.
    Fed.R.Civ.P. 23(a) (emphasis added). Failure to satisfy (1) and (2), consisting of the numerosity and commonality criteria, would preclude certifying a class action at all.

The third step of the process is to give other plaintiffs an opportunity to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy requirements. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). In seeking evidence that could rebut the presumptive lead plaintiff's showing on these points, other plaintiffs may be allowed to conduct discovery if they "demonstrate[ ] a reasonable basis for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iv).

At first glance, it may seem incongruous to allow other plaintiffs to present evidence casting doubt on the determination just made by the district court that the presumptive lead plaintiff satisfies Rule 23's adequacy and typicality requirements, but the apparent incongruity is easily resolved: At step two of the process, when the district court makes its initial determination, it must rely on the presumptive lead plaintiff's complaint and sworn certification; there is no adversary process to test the substance of those claims. *See Cendant,* 264 F.3d at 264. At the third stage, the process turns adversarial and other plaintiffs may present evidence that disputes the lead plaintiff's prima facie showing of typicality and adequacy. The district court may need to hold an evidentiary hearing, and to make a renewed determination **\*731** of typicality and adequacy. *See id.* at 268.[6]

6    Amici California Public Employees' Retirement System and Barclays Global Investors, N.A. argue that the adequacy standard at the third step of the process must be different and more stringent than at step two. "To hold otherwise," amici argue, "*would give it no practical effect,* an impermissible result under the rules of statutory construction." Amici Br. at 15 (emphasis added). Amici have overlooked the portion of *Cendant* that harmonizes these two steps, *see Cendant,* 264 F.3d at 263-64 (concluding that the adequacy standard is the same at both steps, but requiring only a prima facie showing at step two), even though Amici discuss the case at length elsewhere in their brief. *See* Amici Br. at 19, 19-23 (accusing petitioners of "mischaracteriz[ing] the facts underlying [*Cendant*] and the basis for the Third Circuit's decision").

If, as a result of this process, the district court determines that the presumptive lead plaintiff does not meet the typicality or adequacy requirement, it then must proceed to determine whether the plaintiff with the next lower stake in the litigation has made a prima facie showing of typicality and adequacy. If so, it must declare *that* plaintiff the presumptive lead plaintiff and repeat step three of the process by giving other plaintiffs an opportunity to rebut that showing. This process must be repeated sequentially until all challenges have been exhausted. *See id.*[7]

[7] We need not consider what happens where no plaintiff willing to serve as lead satisfies the typicality and adequacy requirements. In those circumstances, perhaps the case cannot be maintained as a class action, *see, e.g., Pattillo v. Schlesinger,* 625 F.2d 262, 265 (9th Cir.1980); *Fendler v. Westgate-California Corp.,* 527 F.2d 1168 (9th Cir.1975). Or, as Amicus Securities and Exchange Commission suggests, the district court may have discretion to relax the rigor of Rule 23's requirements. Amicus Br. of SEC at 18 n. 6. Because this question is not presented, we do not answer it.

## II

[2] The procedure employed by Respondent for identifying the lead plaintiff departs significantly from that outlined above. The court started on the right foot by identifying the Cavanaugh group and each of its members as the plaintiffs with the largest financial stake in the litigation.[8] The court quickly went off the statutory track, however, by failing to give effect to the presumption that the Cavanaugh group would be lead plaintiff unless it failed to satisfy Rule 23(a)'s typicality or adequacy requirement. *See* n. 2 *supra.* The court discounted the significance of the statutory presumption based on its understanding that "the presumption was an effort by Congress to encourage the involvement of institutional investors in securities class actions." *Quintus I,* 201 F.R.D. at 487. The court reasoned that "[b]ecause no institutional investors are

involved in this case, the primary objective of the presumption is absent," *id.,* and demoted the presumption to the rank of "one important element of this decision." *In re Quintus Sec. Litig.,* 148 F.Supp.2d 967, 972 (N.D.Cal.2001) (hereinafter, *Quintus II* ).[9]

[8] While a "group of persons" can collectively serve as a lead plaintiff, 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I), we are not asked to determine whether a group can satisfy the "largest financial interest" requirement by aggregating losses.

[9] The district court's order appointing Barton lead plaintiff appeared in *In re Quintus Securities Litigation,* 201 F.R.D. 475 (N.D.Cal.2001). Before the Cavanaugh group filed their petition for writ of mandamus, the district court issued a second order, *In re Quintus Securities Litigation,* 148 F.Supp.2d 967 (N.D.Cal.2001), in which it appointed a lead plaintiff in the unrelated *Quintus* litigation and also "further explain[ed] the court's designation of Barton to serve as lead plaintiff" in our case. *Id.* at 969.

This, of course, was error. Congress enacts statutes, not purposes, and courts **\*732** may not depart from the statutory text because they believe some other arrangement would better serve the legislative goals. Here, the Reform Act provides in categorical terms that the *only* basis on which a court may compare plaintiffs competing to serve as lead is the size of their financial stake in the controversy. Once it determines which plaintiff has the biggest stake, the court must appoint that plaintiff as lead, unless it finds that he does not satisfy the typicality or adequacy requirements.

Having freed itself of the statutory presumption, the district court engaged in a freewheeling comparison of the parties competing for lead plaintiff, questioning them about their business acumen, their knowledge of the lawsuit and, especially, their fee arrangements with their respective lawyers. *See Quintus I,* 201 F.R.D. at 492-93. But a straightforward application of the statutory scheme, as outlined above, provides no occasion for comparing

In re Cavanaugh, 306 F.3d 726 (2002)
Fed. Sec. L. Rep. P 91,978, 53 Fed.R.Serv.3d 763, 02 Cal. Daily Op. Serv. 9485...

plaintiffs with each other on any basis other than their financial stake in the case. Once that comparison is made and the court identifies the plaintiff with the largest stake in the litigation, further inquiry must focus on that plaintiff alone and be limited to determining whether he satisfies the other statutory requirements. That the district court believes another plaintiff may be "more typical" or "more adequate" is of no consequence. So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead plaintiff status, even if the district court is convinced that some other plaintiff would do a better job.[10] Nor does the Reform Act authorize the district judge to examine the relative merits of plaintiffs seeking lead status on a round-robin basis. The statutory process is sequential: The court must examine potential lead plaintiffs one at a time, starting with the one who has the greatest financial interest, and continuing in descending order if and only if the presumptive lead plaintiff is found inadequate or atypical.

[10] Chief Judge Becker made the same point in *Cendant:*
> [O]nce the presumption is triggered, the question *is not* whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a "fair[ ] and adequate[ ]" job. We ... stress that the inquiry *is not* a relative one. *Cendant,* 264 F.3d at 268.

[3] The district court justified its decision to reject the Cavanaugh group as lead plaintiff based entirely on what the court found to be deficiencies in the group's fee agreement with its law firm. Specifically, the court held that the Cavanaugh group did not satisfy Rule 23(a)'s adequacy requirement because its fee agreement was less advantageous than the fee agreement Barton had negotiated with his lawyers. *See Quintus I,* 201 F.R.D. at 487-88.

[4] The district court has latitude as to what information it will consider in determining typicality and adequacy. The presumptive lead plaintiff's choice of counsel and fee arrangements may be relevant in ensuring that the plaintiff is not receiving preferential treatment through some back-door financial arrangement with counsel, or proposing to employ a lawyer with a conflict of interest. But this is not a beauty contest; the district court has no authority to select for the class what it considers to be the best possible lawyer or the lawyer offering the best possible fee schedule. Indeed, the district court does not select class counsel at all.[11] Rather, **\*733** such information is relevant only to determine whether the presumptive lead plaintiff's choice of counsel is so irrational, or so tainted by self-dealing or conflict of interest, as to cast genuine and serious doubt on that plaintiff's willingness or ability to perform the functions of lead plaintiff. *See Cendant,* 264 F.3d at 266.

[11] At a later stage in the proceedings, the district court must approve the lead plaintiff's choice of counsel, but Congress gave the lead plaintiff, and not the court, the power to select a lawyer for the class. *See* p. 734 & n. 14 *infra.*

[5] [6] Of course, if the presumptive lead plaintiff has selected a lawyer who just graduated from law school, or a sole practitioner who appears to lack the staff to handle a major class action lawsuit, the district court should inquire how the lawyer proposes to get the job done. If no satisfactory answer is forthcoming, the court may consider whether the plaintiff's decision to select that lawyer casts doubt on his ability to handle the responsibilities of lead plaintiff. Similarly, if the presumptive lead plaintiff has selected as counsel a family member or a lawyer who has a conflict of interest, this too may bear on the plaintiff's adequacy. *See, e. g., Pattillo,* 625 F.2d at 265. However, the court must keep firmly in mind that the inquiry is not into the adequacy or fitness of counsel but into the adequacy of plaintiff, and the choice of counsel is only an indicator-and a relatively weak one at that-of plaintiff's fitness.[12] That another plaintiff has chosen counsel more wisely or parsimoniously in the district court's view will not support a finding that the presumptive lead plaintiff is inadequate to serve in that position.

[12] Even if a presumptive lead plaintiff has selected counsel the court believes cannot adequately represent the class, this can only serve as a basis for finding the plaintiff is inadequate if the poor choice of counsel reflects some broader deficiency on his part that

**In re Cavanaugh, 306 F.3d 726 (2002)**

Fed. Sec. L. Rep. P 91,978, 53 Fed.R.Serv.3d 763, 02 Cal. Daily Op. Serv. 9485...

makes him incapable of representing the class. Before disqualifying a presumptive lead plaintiff on this ground, and thus rejecting the statutory preference for the plaintiff with the largest stake in the controversy, the court should, at the very least, advise the plaintiff about its doubts and ask him whether he would be willing to serve as lead, even if the court were to disapprove his choice of counsel and he were forced to seek the services of another attorney.

We are unpersuaded by the district court's strongly held view that a plaintiff's adequacy under Rule 23 can be judged by how advantageous an attorney's fee deal he manages to negotiate. *See Quintus I,* 201 F.R.D. at 482. To begin with, a lead plaintiff's retainer agreement is far from the final word on what counsel will actually get paid, because class counsel must first be appointed, "subject to the approval of the court," 15 U.S.C. § 78u-4(a)(3)(B)(v), and in the normal case (virtually the universal case) where there is a settlement, the court must approve the actual fees paid, subject to the Reform Act's limitations. *See* 15 U.S.C. § 78u-4(a)(6). Thus, negotiations with counsel before lead plaintiff has even been appointed have an inherently hypothetical and contingent quality, making them a relatively poor indicator of plaintiff's adequacy to serve as lead.[13] Aware that actual fees paid will be subject to close judicial scrutiny based on counsel's actual work done and results achieved, an adequate plaintiff could rationally be less concerned with negotiating an advantageous fee schedule and more concerned with securing the services of the lawyer **\*734** that he believes is likely to obtain an excellent result.

[13]

At best, such an agreement serves as a cap, because the court will seldom approve a fee award that exceeds the terms of the retainer agreement, but the court has wide latitude to go below the agreed amount in actually awarding fees. An aggressively negotiated fee agreement does not relieve the district court of the responsibility of reviewing the fees actually paid to ensure that they are fair to the class and

otherwise meet the Reform Act's standards.

Second, selecting the most adequate plaintiff based on who the district court believes did the best job of negotiating with his lawyer can undermine the statutory presumption that the plaintiff with the largest stake in the controversy normally serves as lead plaintiff. Here, for example, the district court appointed as lead Quinn Barton, whose estimated $59,000 loss was by far the smallest of the known plaintiffs, being only 20 percent of Chenoweth's loss and less than 2 percent of the aggregate losses of the Cavanaugh group. *See* n. 1 *supra.*

[7] Finally, allowing the district court to select the lead plaintiff based on its view of who has negotiated the most favorable fee schedule improperly interferes with the lead plaintiff's authority and responsibility to select counsel who he believes will best serve his own interests and the interests of the class. The choice of counsel has traditionally been left to the parties, whether they sue in their individual capacities or as class representatives. *See Cendant,* 264 F.3d at 254. Selecting a lawyer in whom a litigant has confidence is an important client prerogative and we will not lightly infer that Congress meant to take away this prerogative from securities plaintiffs. And, indeed, it did not. While the appointment of counsel is made subject to the approval of the court, the Reform Act clearly leaves the choice of class counsel in the hands of the lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v); *Cendant,* 264 F.3d at 273.[14] Making the Rule 23 adequacy determination turn on who the court believes negotiated the best fee schedule puts pressure on plaintiffs wishing to serve as lead to select counsel who offer the lowest fees rather than counsel who they believe would do the best job. Effectively, this gives the district court authority to select class counsel by declaring as "most adequate" the plaintiff who hired the firm the court prefers.[15]

[14]

In the order under review, the district court engaged in a lengthy discussion of various forms of "auctions" used by some district courts in selecting class counsel. *See Quintus I,* 201 F.R.D. at 483-86. We have never approved this practice and note our agreement with the Third Circuit that "an auction is not generally permissible in a Reform Act case, at least as a matter of first resort." *Cendant,* 264 F.3d at 273. As the Third Circuit correctly noted, "the

choice [of counsel] belongs to the lead plaintiff," *id.* at 274, and "the Reform Act evidences a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection and counsel retention. When a properly-appointed lead plaintiff asks the court to approve its choice of lead counsel and of a retainer agreement, the question is not whether the court believes that the lead plaintiff could have made a better choice or gotten a better deal. Such a standard would eviscerate the Reform Act's underlying assumption that, at least in the typical case, a properly-selected lead plaintiff is likely to do as good or better job than the court at these tasks." *Id.* at 276.

The district court was quite clear that it was not trying to determine whether different plaintiffs had, in their own way, negotiated adequate deals with their lawyers. Rather, the court was looking for the plaintiff who negotiated what the court thought to be the *best* deal:

> Quite simply, a negotiated deal with the best, competitive terms supports an inference that the negotiating plaintiff is the most adequate plaintiff. *Quintus I,* 201 F.R.D. at 487.

This is what happened here. The Cavanaugh group hired as its lawyer Milberg Weiss, a firm the district court recognized has "substantial" experience in the field; "indeed," continued the district court, "its position in this practice is unrivaled" and "[n]o other firm comes close to having [Milberg Weiss's] market share." *Quintus* **\*735** *II,* 148 F.Supp.2d at 978. Its fees, discussed above, *see* p. 728 *supra,* reflect its size and preeminence. Beatie and Osborn is a much smaller firm, less experienced in the field, and perhaps hungrier for the business, with lower fees to reflect it. *See id.* The two fee schedules also reflect a philosophical difference: Beatie's fee percentage decreases with the size of the recovery, whereas

Milberg's goes up. Beatie's approach reflects what the district court termed the philosophy of giving the client the benefit of "economies of scale." *Quintus I,* 201 F.R.D. at 488. Milberg's fee schedule, by contrast, reflects the view that counsel will work harder to increase the size of recovery if there is a larger pot at the end of the rainbow. The district court obviously favored the Beatie approach, though recognizing that Milberg's has respectable support as well. *Id.* (citing John C. Coffee, Jr., *Securities Class Auctions,* Nat'l L.J., Sept. 14, 1998). In the end, the district court concluded that "[b]ecause of the comparative extravagance of the fees it proposes [to pay Milberg], [the Cavanaugh group] has failed to demonstrate that it has negotiated a reasonably competitive fee arrangement," and therefore had proven itself inadequate to serve as lead plaintiff. *Id.*

We cannot agree that a presumptive lead plaintiff becomes inadequate to represent the class because he chooses to hire the most experienced firm in the field.[16] Of course, the larger, more established firm will normally have the heftier fee schedule. Lawyers and law firms work hard to develop reputations for success, and we in the legal profession widely accept the proposition that an aggressive, competent lawyer can make a substantial difference in the outcome of the case. A plaintiff facing large losses and a tough case may rationally conclude that he will be better off by hiring the more expensive, and more formidable, advocate, who may intimidate defendants into a prompt settlement on favorable terms.

[16] The district court relied on one (apparently unpublished) study that showed that Milberg Weiss handled 31 percent of all the securities class actions from 1988 to 1999, the most of any firm. *Quintus II,* 148 F.Supp.2d at 981 (citing Mukesh Bajaj et al., *Securities Class Action Settlements: An Empirical Analysis* (Nov. 16, 2000), *available at* http:// securities.stanford.edu/research/ studies/20001116 SSRN_Bajaj.html). The same paper showed that "Milberg cases settled for a median amount that was 61 percent higher than the median settlements involving other attorneys ($4.5 million versus $2.8 million)." *Id.* The district court discounted the significance of this differential on the ground that "it seems

likely that the larger median settlement Milberg cases is attributable to prudent case selection rather than more skillful lawyering," *id.,* but the "evidence" on which the court relied for this conclusion was based on the hypothetical and easily debatable projections of the study. We note that the study apparently has not yet undergone peer review, the district court never qualified its authors as experts, and the parties never had a chance to dispute its conclusions.

The district court rejected this common-sense proposition based on its views that lawyers don't make much difference in securities class actions,[17] and that Milberg **\*736** Weiss in particular is overrated and doesn't really deserve the higher fees it receives. *See* n. 16 *supra.* The district court's ruminations may (or may not) have a legitimate place when the court determines the award of attorney's fees, but they cannot justify the court's conclusion that the decision to hire Milberg Weiss is so irrational or extravagant as to disqualify the Cavanaugh group from serving as lead plaintiff. Milberg Weiss is a fine firm, as is Beatie and Osborn-as are numerous other firms that practice in this area. *See, e.g., Quintus II,* 148 F.Supp.2d at 974-79. Their business plans may be different, their fee schedules may be different and they may have different strengths and weaknesses vis-à-vis one another. But this doesn't mean there is only one firm that a rational plaintiff could choose. As noted above, there may be fee arrangements that so reek of self-dealing or other impropriety as to suggest that the plaintiff may have sold out the class's financial interests to the lawyer, but beyond such extreme situations there is a wide variety of financial arrangements the proposed lead plaintiff may enter into with his chosen counsel without being stricken as inadequate by the district court.[18]

[17]    Responding to the contrary view of Professor Coffee, the district court stated as follows:
First, recoveries in securities class actions of the type at bar are not solely (or even primarily) the product of class counsel's efforts; evidence discoverable, the availability of funding sources such as the

amounts and layers of insurance coverage and other factors wholly independent of class counsel's efforts determine recoveries to a much greater extent. This means that counsel often do not have to work harder to achieve a greater recovery, making the extra incentive of an increasing fee unnecessary. Second, and related, because counsel often do not have to work harder for an increased fee, an increasing percentage fee arrangement amounts to a windfall for counsel. Finally, to the extent greater efforts are needed to capture an increased fee and those efforts are not fully compensated by a decreasing percentage fee, counsel's professional obligation to achieve the best outcome possible for the class prevents a cheap settlement. A sell-out for less than a reasonable settlement seriously jeopardizes counsel's professional standing. Professor Coffee's fears, at bottom, reflect serious doubts about the ethics of plaintiffs' lawyers, doubts to which the undersigned does not subscribe. The case for increasing percentages seems to overlook the importance of these factors.
*Quintus I,* 201 F.R.D. at 488.

[18]    For example, a retainer agreement that sets counsel's compensation at the fees awarded by the district court in case of a favorable settlement would be entirely adequate.

While we share the learned district judge's concern for reducing the cost of securities class actions, and for making plaintiffs more responsible, we believe the way to

accomplish these purposes is to diligently apply the terms of the Reform Act. Congress was obviously aware of these problems and in 1995 decided how to remedy them. Nothing in our pre-Reform Act caselaw even remotely suggests that a district court may find a plaintiff to be inadequate to serve as class representative under Rule 23(a) because the district court believes he should have hired a different lawyer or the same lawyer for less. The Reform Act did not change this standard; rather, it adopted the typicality and adequacy requirements of Rule 23 in haec verba. We conclude, therefore, that the Reform Act did not change the standard for adequacy, and that the adequacy inquiry remains the same in determining the lead plaintiff in securities cases as in determining the class representative in other cases brought under Rule 23.

We are aware that the Fifth Circuit came to a different conclusion in *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 483 (5th Cir.2001). It stated:

> Any lingering uncertainty, with respect to the adequacy standard in securities fraud class actions, has been conclusively resolved by the [Reform Act's] requirement that securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation. In this way, *the [Reform Act] raises the standard adequacy threshold.*

*Id.* at 483 (emphasis added). On denying a petition for rehearing, the Fifth Circuit later elaborated: "[W]e mean to emphasize **\*737** that Congress enacted the 'lead plaintiff' provisions ... to direct courts to appoint, as lead plaintiff, *the most sophisticated investor available* and willing so to serve in a putative securities class action.... [T]he lead plaintiff should be an investor capable of understanding and controlling the litigation." *Berger v. Compaq Computer Corp.,* 279 F.3d 313, 313 (5th Cir.2002) (emphasis added).

The SEC takes a similar position in its amicus brief,[19] but neither the Fifth Circuit nor the SEC have pointed to any language in the statute that either "raises the standard adequacy threshold" or gives a district court authority to select as lead plaintiff "the most sophisticated investor available." The Fifth Circuit cites no authority for its assertions, either in its opinion or in its order denying rehearing. The SEC points vigorously to the Reform Act's legislative history, which mentions the various concerns that prompted Congress to pass the statute:

[19]  The Third Circuit in *Cendant* waves a bouquet in the general direction of the district court's opinion below, *see Cendant,* 264 F.3d at 265 & n. 46, seemingly supporting a more aggressive role for district courts in selecting as lead plaintiff the party who negotiates the best deal with his lawyer, but this is entirely dicta. More relevant is its discussion, on the immediately succeeding page of its opinion, where it states:

> We stress ... that the question at this stage is not whether the court would "approve" that movant's choice of counsel or the terms of its retainer agreement or whether another movant may have chosen better lawyers or negotiated a better fee agreement; rather, the question is whether the choices made by the movant with the largest losses are so deficient as to demonstrate that it will not fairly and adequately represent the interests of the class, thus disqualifying it from serving as lead plaintiff at all.

*Id.* at 266. We read the Third Circuit's position as consistent with our own.

The Reform Act was intended to "protect[ ] investors who join class actions against lawyer-driven lawsuits by ... increas[ing] the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." Conf. Rep. 32. In particular, Congress sought to "encourage institutional investors to take a more active role," which would "ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions." *Id.* at 34; *accord* S. Rep. 4, 6, 10.

Amicus Br. of SEC at 8 (citing H.R. Conf. Rep. No.

WESTLAW     © 2016 Thomson Reuters. No claim to original U.S. Government Works.     12

104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730; S.Rep. No. 104-98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679). While we agree that these concerns animated passage of the Reform Act, we do not believe they support the view that the Act, in the words of the Fifth Circuit, "raises the standard adequacy threshold" or requires the district court to select the plaintiff it believes is "the most sophisticated investor available."[20] To accept this view would put the legislative history cart before the statutory text horse.

[20]   If financial sophistication had been Congress's principal concern, it would not have made the plaintiff who *lost* the most money the presumptive lead plaintiff. Congress must also have been animated by the common-sense notion that the plaintiff with the largest personal stake in the controversy will have the incentive to obtain the best possible result for the class of which he is a member.

In passing the Reform Act, Congress made some very significant changes in the way securities class actions are to be litigated, among the most important being the following: It imposed a heightened pleading standard for securities fraud cases, *see* 15 U.S.C. § 78u-4(b); added a **\*738** requirement that the plaintiff who first files suit publish a notice explaining the nature of his claim and advising other potential plaintiffs that they may move to be appointed lead plaintiff, *see* 15 U.S.C. § 78u-4(a)(3)(A); added a requirement that plaintiffs submit sworn certifications stating that they did not purchase the security in question at the direction of their lawyers or in order to participate in the action, *see* 15 U.S.C. § 78u-4(a)(2)(A)(ii); commanded that the plaintiff with the greatest financial stake in the outcome of the case be appointed lead plaintiff, provided he satisfies the requirements of Rule 23, *see* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); precluded the same party (except with the approval of the court) from serving as lead plaintiff in more than five securities class actions over a three-year period, *see* 15 U.S.C. § 78u-4(a)(3)(B)(vi); and authorized the district court to ratify the lead plaintiff's appointment of counsel, *see* 15 U.S.C. § 78u-4(a)(3)(B)(v).

Each of these provisions serves the purposes disclosed in the Reform Act's legislative history, and together they are calculated to achieve the very goals the legislative history discusses. Thus, the requirement that the plaintiff with the largest stake in the outcome of the case serve as lead plaintiff will doubtless promote the goal of attracting institutional investors, and discourage opportunistic lawsuits by shareholders with a tiny position in the security which is the subject of the litigation. The requirement that plaintiffs certify that they did not buy the security at the direction of their lawyers or for purposes of litigation, as well as the prohibition against professional plaintiffs, will diminish the risk of lawyer-driven lawsuits. The notice requirement will broaden the number of plaintiffs who get involved and seek lead plaintiff status by assuring potential plaintiffs that they still have a chance to take control of the case, even though they have lost the "race to the courthouse." And so on. In construing any of these provisions, it may be appropriate to consult the Reform Act's legislative history. But it is not appropriate to rely on legislative history to add provisions Congress did not put into the statute or to ignore provisions Congress did put there.[21]

[21]   "In the final analysis, how a judge interprets a statute is not simply a matter of his ... views on particular discrete issues, such as whether a statutory purpose should or can be discerned, the reliability of legislative history, or the importance of strict adherence to the text. At issue in statutory interpretation theory is the fundamental conception of the role of the judge in our federal system of coordinate government." John M. Walker, Jr., *Judicial Tendencies in Statutory Construction: Differing Views on the Role of the Judge,* 58 N.Y.U. Ann. Surv. Am. L. 203, 238 (2001).

Congress might, of course, have done more. For example, it could well have raised Rule 23's standard for adequacy or given the district court authority to appoint as lead plaintiff "the most sophisticated investor available"; it might also have instructed the district court to appoint as class counsel the firm that will provide what in the court's judgment is the best representation at the lowest cost. Whether Congress failed to enact these additional innovations because the Reform Act's sponsors believed the changes they did make were sufficient, or because they lacked the political consensus to do more, is beside the point. We are bound by what Congress did, and we may not add to the statute terms that Congress omitted even if we believe they would serve the statutory purpose.

Although Congress made several important changes in the Reform Act, it pointedly did not change the requirements of **\*739** Rule 23. Indeed, it incorporated Rule 23 explicitly in one portion of the statute, *see* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc), and enacted language that is identical to Rule 23's typicality and adequacy requirements in a nearby provision, *see* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Given the many other changes Congress did make, we must infer that its decision to leave the standards of Rule 23 intact was deliberate.

In light of this clear-cut congressional choice, we cannot agree that the Reform Act was meant to "raise the standard adequacy threshold," or to authorize the district court to select as lead plaintiff "the most sophisticated investor available." Nothing in our pre-Reform Act jurisprudence gives the district court the sweeping authority to deny a plaintiff the status of class representative because the court disagrees with his choice of counsel, and nothing in the Reform Act adds such a power.

### Conclusion

We grant the petition for a writ of mandamus and order the district court to vacate its orders appointing Quinn Barton lead plaintiff. The district court should then proceed based on the presumption that the Cavanaugh group is the most adequate plaintiff and has made a prima facie showing of satisfying the requirements of Rule 23. The next step in the process is for the district court to give the other plaintiffs an opportunity to present evidence rebutting the presumption that the Cavanaugh group is most capable of adequately representing the interests of class members. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); pp. 730-31 *supra*.[22] If the other plaintiffs are unable to make this showing, the district court shall appoint the Cavanaugh group as lead plaintiff.

[22] The district court disqualified Chenoweth because he had not selected counsel. But Chenoweth offered a rational explanation for his failure to do so. *See* p. 728 *supra*. While the district court did not find this reason persuasive, that is not the test. As explained above, the district court may only disqualify a presumptive lead plaintiff if it determines that his choice of counsel is so irrational or tainted by self-dealing that the choice casts serious doubt on the plaintiff's ability to serve as lead plaintiff. Chenoweth's decision to defer selection of counsel is neither irrational nor tainted by self-dealing. Consequently, the district court had no basis for disqualifying him from consideration. Indeed, since Chenoweth was not the presumptively most adequate plaintiff, the district court had no cause to pass on his adequacy at all. If the members of the Cavanaugh group should be disqualified, then Chenoweth will have the largest losses of the remaining lead plaintiff candidates. The district court shall consider his adequacy at that time.

No costs.

**WRIT GRANTED.**

WALLACE, Circuit Judge, concurring.

I concur in the judgment of the court, but I write separately to express my concern with the treatment of jurisdiction and the scope of the majority opinion.

I turn first to the threshold question of jurisdiction. "Mandamus is an extraordinary remedy that is granted only in the exercise of sound discretion." *Miller v. French,* 530 U.S. 327, 339, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (internal quotation omitted). In taking jurisdiction of the district court's appointment of lead plaintiff in this securities class action, the majority refers, without analysis, to but one of the five factors enumerated in *Bauman v. United States District Court,* 557 F.2d 650, 654-55 (9th Cir.1977), from which we determine the appropriateness of mandamus jurisdiction. Clearly, the majority's simple statement that "[b]ecause '[t]he district court's order raises new and important problems, [and] issues of law of first impression,' we conclude that it is appropriate to consider the issues [by exercising our powers of mandamus]" is a failure to **\*740** follow the law of *Bauman*. We have specifically stated that we are to weigh the several factors together. *Bauman,* 557 F.2d at

655; *Wash. Pub. Utils. Group v. United States Dist. Court,* 843 F.2d 319, 325 (9th Cir.1987). There are five factors that weigh in favor of exercising our mandamus powers."(1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal.... (3) The district court's order is clearly erroneous as a matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district court's order raises new and important problems, or issues of law of first impression." *Bauman,* 557 F.2d at 654-55 (citations omitted).

The majority skipped to the fifth factor and held that this petition for mandamus raises an issue that is "new and important," and of first impression in this circuit. The standards for appointing lead counsel under the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 (PSLRA), which applies to this case, have not been determined by this circuit. As we have held before, "mandamus is particularly appropriate when we are called upon to determine the construction of a federal procedural rule in a new context." *Valenzuela-Gonzalez v. United States Dist. Court,* 915 F.2d 1276, 1279 (9th Cir.1990). But we should go further and analyze the other *Bauman* factors.

No direct appeal may be taken from the district court's interlocutory lead-plaintiff order, *Z-Seven Fund, Inc. v. Motorcar Parts & Accessories,* 231 F.3d 1215, 1218-19 (9th Cir.2000), and so it is fair to conclude that the plaintiffs do not have an adequate remedy, other than mandamus, from the district court's order. If left uncorrected, plaintiffs are damaged by this order because they will be denied their presumptive statutory right under section 78u-4(a)(3)(B)(iii)(I)(bb) of the PSLRA to direct and oversee the litigation with their choice of counsel. We have previously found mandamus appropriate where a district court improperly denies a civil litigant his choice of trial counsel, as once the trial is over, there is no way to correct such an error on appeal. *Christensen v. United States Dist. Court,* 844 F.2d 694, 697 (9th Cir.1988). I also believe that the error in this case constitutes an "oftrepeated error," as this is an approach Judge Walker consistently has taken.

Furthermore, the district court's order appointing Quinn Barton lead plaintiff is clear error. An order is clearly erroneous if the reviewing court has a "definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust,* 508 U.S. 602, 623, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993);

*Allen v. Iranon,* 283 F.3d 1070, 1076 (9th Cir.2002). As discussed later, I believe a clear procedural error was committed in this case. Thus, all of the *Bauman* factors weigh in favor of mandamus jurisdiction in this case, and I agree with the majority that we ought to exercise that power.

In applying mandamus appellate jurisdiction, we review the district court's underlying action for clear error. *Z-Seven Fund,* 231 F.3d at 1219-20. Clear error is present in this case because, as the majority states, the district court failed to follow the statutory procedures for appointing a lead plaintiff as they are outlined in the PSLRA. The statute requires the district judge to identify the plaintiff or group of plaintiffs with the largest financial stake in the controversy, who then presumptively become the "most adequate plaintiff." 15 U.S.C. § 78u-4(a)(3)(B)(iii). In this case, the district court did make the initial determination that the Cavanaugh group and **\*741** each of its members are the plaintiffs with the largest financial stake in the litigation.

I agree with the majority that the district court then significantly departed from the statute. The district court referred to the presumption as "one important element of this decision." *In re Quintus Sec. Litig.,* 148 F.Supp.2d 967, 972 (N.D.Cal.2001). It then made simple comparisons of the parties vying to be lead plaintiff and their respective counsel, and concluded that another party had negotiated a better fee arrangement, making the Cavanaugh group no longer the most adequate plaintiff. However, by statute, the presumption of most adequate plaintiff may be overcome only upon proof that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Thus, the district court's comparisons of the parties and their fee arrangements were inappropriate because the question mandated by the statute is whether the presumptive lead plaintiff is adequate, not whether another prospective lead plaintiff comparatively might have made a better bargain and is somehow "more adequate." The district court was required by the PSLRA to appoint presumptively the Cavanaugh group as lead plaintiff, and remove them from that position *only* after a finding that they are inadequate under 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). This the district court did not do. Based on this clear error, I believe it is appropriate for us to remand to the district court for compliance with the statutory framework of the PSLRA. That is all we need do.

The majority and I part company on the scope of our

decision. The majority makes broad statements in dicta that information regarding fee arrangements between the presumptive lead plaintiff and his counsel "is relevant only to determine whether the presumptive lead plaintiff's choice of counsel is so irrational, or so tainted by self-dealing or conflict of interest, as to cause genuine and serious doubt on that plaintiff's willingness or ability to perform the functions of lead plaintiff." I disagree, and I am unwilling to foreclose, as I think the majority does, the relevance of such information to district court's making a determination under Rule 23. Poor fee negotiation may show an unfamiliarity with the merits of the case, or undue influence of counsel, and such evidence certainly is a concern in deciding whether a plaintiff is adequate. *See, e.g., Larson v. Dumke,* 900 F.2d 1363, 1367 (9th Cir.1990) (holding that "plaintiff's unfamiliarity with the litigation and unwillingness to learn about the suit" and "the degree of control exercised by the attorneys over the litigation" are factors to be considered in determining the adequacy of a securities litigation plaintiff). The district court should have latitude to consider such information within the confines of the statutory framework.

The majority also devotes part of its opinion to ruminations on the quality of the firms selected by the prospective lead plaintiffs in this case, and the fee negotiations between them. I do not think that such contemplation is appropriate for an appellate court, whose job it is to determine only whether the district court committed a "clear error," for if the trial court's "account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."

*Phoenix Eng'g & Supply Inc. v. Universal Elec. Co.,* 104 F.3d 1137, 1141 (9th Cir.1997), *quoting Anderson v. Bessemer City,* 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). We do not hold in this case that the parties had high(or low-) quality counsel, we hold only that the district **\*742** court should not have made such determinations for purposes of comparing the parties. The district made a procedural mistake and we remand for the court to follow the statutory mandate of the PSLRA. If the case returns, we will have adequate opportunity to evaluate the facts.

I also believe the majority exceeds the appropriate scope of our review by discussing, in footnote 22, the rights of Chenoweth, who is not a party to this appeal, and whose rights are not before us in this decision. Having decided that remand to the district court for a following of the statutory mandate in selecting lead plaintiff is required, I do not believe we need to determine what Chenoweth's rights *might* be.

I therefore concur in the judgment of the court, writing separately only to emphasize my concern that the role of the district court not be improperly usurped by broad-ranging dicta.

**All Citations**

306 F.3d 726, Fed. Sec. L. Rep. P 91,978, 53 Fed.R.Serv.3d 763, 02 Cal. Daily Op. Serv. 9485, 2002 Daily Journal D.A.R. 10,677

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.