**In re Forcefield Energy Inc. Securities Litigation, Not Reported in F.Supp.3d (2015)**

2015 WL 4476345, Fed. Sec. L. Rep. P 98,580

# EXHIBIT 7

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                    1

2015 WL 4476345, Fed. Sec. L. Rep. P 98,580

EXHIBIT 7

2015 WL 4476345
United States District Court,
S.D. New York.

In re FORCEFIELD ENERGY INC. SECURITIES
LITIGATION.
Lori Atkinson, Plaintiff,
v.
Forcefield Energy Inc., David Natan, Jason
Williams, Richard St–Julien, the Dreamteam
Group, and Mission Investor Relations d/b/a
Missionir, Defendants.
Hannah Miller, Plaintiff,
v.
Forcefield Energy Inc., David Natan, Jason
Williams, Richard St–Julien, the DReamteam
Group, and Mission Investor Relations d/b/a
Missionir, Defendants.
Dean Rosales and Nirav Shah, Plaintiffs,
v.
Forcefield Energy Inc., David Natan, Jason
Williams, Richard St–Julien, Defendants.

Nos. 15 Civ. 3020(NRB), 15 Civ. 3141(NRB), 15
Civ. 3279(NRB).
|
Signed July 22, 2015.

*MEMORANDUM AND ORDER*

NAOMI REICE BUCHWALD, District Judge.

*I. BACKGROUND*

**\*1** Defendant ForceField Energy Inc. ("ForceField")
holds itself out as a designer, distributor, and licensor of
alternative energy products, such as LED lights,
chemicals used in the production of photovoltaic cells,
and "heat recovery" devices that convert heat into
electrical energy.[1] On the morning of April 15, 2015, an
article on the website *Seeking Alpha* reported that
ForceField had engaged penny-stock promoters to inflate
its stock price, that ForceField was short on cash, and that
some of ForceField's managers had previously engaged in
fraud and money laundering. Soon thereafter, the FBI

arrested ForceField's executive chairman, Richard St.
Julien, for securities fraud while St. Julien was attempting
to board a plane to Costa Rica.[2] On May 4, the SEC halted
trading in ForceField's stock, *see* Order, *ForceField
Energy Inc.,* File No. 500–1 (S.E.C. May 4, 2015).

| | |
|---|---|
| 1 | Except where noted, the facts in this paragraph are derived from the filed complaints. We provide these facts for context only, and make no findings as to whether these allegations are true. |
| 2 | St. Julien remains under arrest but has not been indicted. *See* Order to Continue, *United States v. St. Julien,* 1:15–mj–00356–MDG (E.D.N.Y. July 20, 2015), ECF No. 15. |

Within days of the *Seeking Alpha* article, plaintiffs filed
the three above-captioned class actions, suing ForceField,
three ForceField executives, and two stock promoters for
securities fraud pursuant to the Securities Exchange Act.[3]
In compliance with procedures set forth in the Private
Securities Litigation Reform Act,[4] plaintiff Lori Atkinson
published an "early notice" on April 17 to advise the
public of her class action and to set a deadline for class
members to move for appointment as lead plaintiff.

| | |
|---|---|
| 3 | Securities Exchange Act of 1934, §§ 10(b), 20(a), 15 U.S.C. §§ 78j(b), 78t(a) (2012); SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (2014). |
| 4 | Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u–4(3)(A). |

Six class members or groups of class members filed
timely motions for appointment.[5] Three dropped their
bids,[6] leaving Beverly Brewer, Bengt Ling, and the
self-styled "Lovell Group" in competition. Besides
appointment of the movant as lead plaintiff, each motion
seeks appointment of the movant's counsel as lead

2015 WL 4476345, Fed. Sec. L. Rep. P 98,580

counsel for the putative class and consolidation of the three pending class actions. Each of the remaining movants filed timely oppositions to each other's motions, and timely replies in support of their own.[7]

[5]     *See* Mot. to Consolidate Cases ("Haws Mot."), ECF No. 3; Mot. to Appoint Counsel The Rosen Law Firm ("Brewer Mot."), ECF No. 6; Mot. to Consolidate Cases ("Sinclair Mot."), ECF No. 8; Mot. to Appoint Lovell Grp. ("Lovell Mot."), ECF No. 12; Mot. to Consolidate Cases ("Ling Mot."), ECF No. 15; Mot. to Appoint Renata White & Robert Whiting ("White Mot."), ECF No. 18 (collectively, the "Lead Plaintiff Motions"); *see also* Mem. of Law in Supp. of Beverly Brewer ("Brewer Mem."), ECF No. 7; Mem. of Law in Supp. of the Lovell Grp.'s Mot. ("Lovell Mem."), ECF No. 13; Mem. of Law in Supp. of Bengt Ling's Mot. ("Ling Mem."), ECF No. 16.

[6]     *See* Notice of Withdrawal of Mot., June 26, 2015, ECF No. 23 (withdrawing Sinclair Mot.); Notice of Withdrawal of Mot., ECF No. 25 (withdrawing Haws Mot.); Notice of Non–Opp., ECF No. 26 (withdrawing White Mot.).

[7]     *See* Opp. of Beverly Brewer to Competing Lead Pl. Mots. ("Brewer Opp."), ECF No. 24; Mem. of Law in Further Supp. of the Lovell Grp.'s Mot. ("Lovell Opp."), ECF No. 27; Mem. of Law in Further Supp. of Bengt Ling's Mot. ("Ling Opp."), ECF No. 28; Reply Mem. of Law in Further Supp. of Bengt Ling's Mot. ("Ling Reply"), ECF No. 32; Reply Mem. of Law in Further Supp. of the Lovell Grp.'s Mot. ("Lovell Reply"), ECF No. 33; Reply of Beverly Brewer in Further Supp. of Lead Pl. Mot.

("Brewer Reply"), ECF No. 35.

For the reasons set forth below, we appoint Beverly Brewer as lead plaintiff, approve her selection of interim counsel under Rule 23(g)(3),[8] and consolidate the three class actions.

[8]     To the extent that Brewer requests final appointment of class counsel, her motion is denied without prejudice. We will appoint class counsel at the certification stage.

## II. DISCUSSION

### A. Consolidation

As the related securities class actions contain the same factual and legal issues, we consolidate them under Rule 42(a) of the Federal Rules of Civil Procedure. *See Atwood v. Intercept Pharm., Inc.,* 299 F.R.D. 414, 415 (S.D.N.Y.2014). All relevant filings and submissions shall be maintained as one file as case number 15 Civ. 3020(NRB) with the caption *In re ForceField Energy Inc. Securities Litigation.*

### B. Appointment of Lead Plaintiff

#### 1. The PSLRA

The PSLRA governs the appointment of a lead plaintiff in "each private action arising under the [Securities Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u–4(a)(1). In a class action arising under the Securities Exchange Act, a court must "appoint as lead plaintiff the member ... of the purported plaintiff class that the court determines to be the most capable of adequately representing the interests of class members," known as the "most adequate plaintiff." 15 U.S.C. § 78u–4(a)(3)(B)(i). In selecting a lead plaintiff, we are to presume that the "most adequate plaintiff" is the person or group of persons who:

> **\*2** (aa) has either filed the complaint or made a motion in response to a notice ...;
>
> (bb) in the determination of the court, has the largest

2015 WL 4476345, Fed. Sec. L. Rep. P 98,580

financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

§ 78u–4(a)(3)(B)(iii)(I).

The PSLRA is not explicit as to how a court should determine which plaintiff has the "largest financial interest" in the relief sought by the class. Courts in this Circuit have considered (1) the total or gross number of shares purchased during the class period; (2) the number of shares purchased during the class period, net of sales during the class period; (3) the net funds expended during the class period; and (4) the approximate losses suffered. *See, e.g., Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co.,* 229 F.R.D. 395, 404 (S.D.N.Y.2004) (relying on *Lax v. First Merchants Acceptance Corp.,* No. 97 C 2715, 1997 WL 461036, at *5, 1997 U.S. Dist. LEXIS 11866, at *17 (Aug. 11, 1997)). We, as other courts, shall place the greatest emphasis on the last of the four factors—the approximate loss suffered by the movant—which corresponds most directly to the "relief sought by the class." *See Teran v. Subaye, Inc.,* Nos. 11–cv–2614 (NRB), –3886, 2011 WL 4357362, at *2, 2011 U.S. Dist. LEXIS 105774, at *6 (S.D.N.Y. Sept.16, 2011) (citing cases). In assessing the potential lead plaintiffs' financial interests, we may consider the financial interest of a group of plaintiffs in the aggregate if the group "will be able to function cohesively and to effectively manage the litigation apart from their lawyers." *Varghese v. China Shenghuo Pharm. Holdings,* Inc., 589 F.Supp.2d 388, 392 (S.D.N.Y.2008).

The presumption that the plaintiff with the largest financial interest is the "most adequate" may be rebutted only upon "proof ... that the presumptively most adequate plaintiff—(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render [him] incapable of adequately representing the class." § 78u–4(a)(3)(B)(iii)(II). Rule 23 requires that a lead plaintiff "fairly and adequately protect the interests of the class" and that the lead plaintiff's claims be "typical" of class members' claims. Fed.R.Civ.P. 23(a)(3)-(4). At this stage, only a "preliminary showing" of typicality and adequacy is required, *In re eSpeed, Inc. Sec. Litig. .,* 232 F.R.D. 95, 102 (S.D.N.Y.2005).

### 2. The Proposed Lead Plaintiffs

#### a. Brewer

Beverly Brewer retains 639,062.50 valueless[9] shares, which she purchased at a cost of $4 per share between December 15, 2013, and December 24, 2014. *See* Brewer Mem., Ex. 3. These shares were not purchased on the open market, but were obtained at a fixed price in exchange for bond warrants or in lieu of interest payments. *See id.* Ex. 2 (listing transactions with references to interest payment conversions and warrants); Notice, June 23, 2015, ECF No. 21–1 (legible version of the same). Accordingly, Brewer's losses on her shares of ForceField equity are $2,556,250.

[9]

We assume for purposes of this decision that any unsold ForceField shares have zero value. This is a reasonable assumption at this stage because ForceField stock is no longer traded on a public exchange, ForceField stock is quoted (if at all) at a nugatory price, and ForceField has defaulted on five convertible notes. *See* Form 10–Q at F–14, F–19, 13, *ForceField Energy Inc .,* Comm'n File No. 001–36133 (S.E.C. filed June 18, 2015); FNRG Price Quote, Wall St. J. (online ed.), http://quotes.wsj.com/FNRG (quoting closing price of $0.02 on July 15, 2015).

**\*3** Additionally, Brewer holds a ForceField note with face value of $1.25 million. *See* Brewer Mem., Ex. 2; Brewer Reply 4. The note's current value is unclear, and Brewer's motion does not rely on any losses related to this note.

#### b. The Lovell Group

The "Lovell Group" consists of Dionisio Flores, Eduardo David, and the T. Lovell Alpha Limited Partnership ("T. Lovell Alpha"). Flores and David are brothers-in-law who have no connection to T. Lovell Alpha except that they share the same counsel in this case.[10]

[10]

Despite the filing of sworn declarations that T. Lovell Alpha and the brothers-in-law plan to coordinate their oversight of counsel, *see* ECF Nos. 34, 36, it is doubtful that T. Lovell Alpha's losses should be aggregated with those of the brothers-in-law for purposes of deciding these motions.

2015 WL 4476345, Fed. Sec. L. Rep. P 98,580

> However, we need not resolve these doubts in light of our determination to appoint Brewer.

David bought his 1,500 shares on April 17, 2015, two days after the critical *Seeking Alpha* article appeared. This timing places David outside the putative class as all three complaints defined it, and makes David's claim susceptible to a defense that his reliance on defendants' false statements was unjustified. Accordingly, David cannot adequately represent the interests of the class, and we consider only Flores and T. Lovell Alpha as viable lead plaintiffs.

We need not perform a detailed calculation of T. Lovell Alpha's and Flores's losses. They concede that their total losses are less than Brewer's, and we accept as roughly accurate their calculation that they suffered approximately $234,000 in losses from the open market transactions.[11] *See* Lovell Reply 5.

[11]  T. Lovell Alpha suffered approximately $1 million in losses resulting from off-market purchases of ForceField equity. In light of the Lovell Group's argument that we should not consider Brewer's off-market transactions, the Lovell Group does not ask us to consider T. Lovell Alpha's off-market losses.

#### c. Ling

Bengt Ling holds 45,000 valueless shares, which he bought between September 30, 2013, and September 9, 2014. The Lovell Group states, and Ling does not deny, that Ling bought these shares at a fixed price of $4 per share in connection with an off-market note exchange, and Ling has not denied this. *See* Lovell Opp. 3; Ling Reply. We calculate that Ling lost $180,000 on his stock purchases.

#### d. Other Potential Plaintiffs

Movants Haws, Sinclair, and White and Whiting do not oppose the other movants' Lead Plaintiff Motions, but each offer to be appointed as lead plaintiff if the other movants are inadequate. In light of our preliminary

determination that Brewer is an adequate lead plaintiff, we do not examine their motions further except to note that their losses were far less than Brewer's.

The named plaintiffs in the three class actions are each eligible for appointment without filing a motion, *see* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(aa), but may not be considered in this instance because their complaints fail to indicate the magnitude of their losses.

#### 3. Arguments in Opposition to Brewer

There is no dispute that Brewer lost the greatest amount of any movant and is therefore the presumptively most adequate plaintiff. The Lovell Group and Ling argue that Brewer is inadequate for two reasons. The Lovell Group asserts that Brewer, unlike most class members, relied on non-public statements by ForceField management, and is therefore ill-suited to litigate a fraud-on-the-market theory of reliance. Ling asks us to recognize distinct equity and debt subclasses, and argues that Brewer, who holds both equity and debt, would be unable to fairly lead the equity subclass.

#### a. Reliance

**\*4** In order to prove a claim of securities fraud, a plaintiff must prove that he relied on the defendant's fraudulent misrepresentation, and may do so in at least two ways. Either the plaintiff may prove reliance directly, by proving that he heard and acted upon defendant's false statement, or he may prove a fraud-on-the-market theory that he relied on the integrity of a price that, through efficient market forces, incorporated defendant's false statement. *See Basic Inc. v. Levinson,* 485 U.S. 224, 246–47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Salvani v. ADVFN PLC,* 50 F.Supp.3d 459, 471–72 (S.D.N.Y.2014). Plaintiffs in class actions typically must plead and prove the fraud-on-the-market theory because proof of direct reliance would require an inquiry into each class member's investment analysis. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. ——, ——, 133 S.Ct. 1184, 1193, 185 L.Ed.2d 308 (2013). Therefore, it is inappropriate to appoint a lead plaintiff whose investment choices resulted from substantially different information than was available to the general public. *See, e.g., In re Indep. Energy Holdings PLC Sec. Litig.,* 210 F.R.D. 476, 482–83 (S.D.N.Y.2002) (rejecting as atypical a proposed lead plaintiff who had bought shares in reliance on his personal relationship with a defendant).

The Lovell Group contends that Brewer purchased her "note and warrants" in reliance on "confidential and/or

2015 WL 4476345, Fed. Sec. L. Rep. P 98,580

selected information provided to movant Brewer by Defendants," Lovell Opp. 2–3, so that Brewer will be subject to an argument that her claims are atypical. This argument fails for two reasons.

First, the Lovell Group's statement that Brewer received private information is speculative. Brewer's reply brief flatly denies that she received any non-public information, *see* Brewer Reply 2, and the Lovell Group presents no evidence to the contrary. The PSLRA requires the Lovell Group to offer "proof," not speculation, that Brewer is atypical of the class. *See Foley v. Transocean Ltd.,* 272 F.R.D. 126, 133 (S.D.N.Y.2011); *Armour v. Network Assocs., Inc.,* 171 F.Supp.2d 1044, 1054 (N.D.Cal.2001). The lack of evidence is especially telling given that T. Lovell Alpha also held ForceField notes at one time, and therefore would be in a position to know the kind of information that ForceField provided to note purchasers.

Second, the fact that Brewer bought her equity shares through off-market transactions is irrelevant to her fraud-on-the-market theory of reliance. The fraud-on-the-market theory depends on the existence of an efficient market whose price signals may be relied upon to inform an investor's choices. Even though Brewer bought equity shares outside the open market through a note exchange program, she plausibly relied on the market's efficient valuation of ForceField equity to determine whether to participate in the note exchange.

Third, the Lovell Group specifically argues that private information contributed to Brewer's "acquisition of *the note and warrants,"* Lovell Opp. 2 (emphasis added), which is distinct from Brewer's subsequent conversion of those notes and warrants into equity. But Brewer seeks appointment based solely upon losses that she sustained by virtue of buying ForceField *equity.* Thus, even if defendants could raise a unique reliance defense against Brewer with respect to her purchase of notes and warrants, defendants could not necessarily raise such a defense with respect to her later accessions to equity.

**\*5** We overrule the Lovell Group's opposition to Brewer's motion because we have no basis at this time to find that Brewer will be subject to a unique reliance defense. Of course, it is possible that we will be required to repeat the present exercise if Brewer is ultimately subject to a colorable defense that renders certification inappropriate. Congress, however, accepted this risk. By directing district courts to choose lead plaintiffs at the earliest stage of class litigation, Congress expressed a judgment that the benefits of appointing a high-loss plaintiff early in litigation would outweigh the costs of occasionally having to replace the lead plaintiff later on.

We will not subvert Congress' policy by selecting a different plaintiff than the presumptively most adequate one on the basis of speculation.

#### b. Subclassing

Ling's argument proceeds in two steps. First, Ling argues that the interests of equity-holders and note-holders are so divided that it will be necessary to divide ForceField investors into separate subclasses. Second, Ling argues that Brewer, who holds both equity and notes, cannot fairly represent the equity subclass, which Ling wishes to represent.[12]

[12]   Ling presents the same argument in opposition to the appointment of T. Lovell Alpha. T. Lovell Alpha denies that it currently holds any ForceField debt and denies that it suffered any compensable losses from holding such debt. In light of our decision to appoint Brewer, we need not resolve this factual dispute or any other dispute regarding the adequacy of the Lovell Group.

Ling relies heavily on *In re Literary Works in Electronic Databases Copyright Litigation,* 654 F.3d 242 (2d Cir.2011), in which the Circuit vacated the district court's class certification and remanded for subclassing. The class in that case comprised authors whose copyrighted works had been published in electronic databases. Some authors ("Category A") had particularly valuable claims because they had registered their works in time to qualify for statutory damages and attorney's fees under the Copyright Act. Others ("Category B") had somewhat less valuable claims because they had registered their works in time to qualify for actual damages and disgorgement, but not for statutory damages and attorney's fees. The vast majority of the class members ("Category C") held claims for infringement of unregistered works, and thus were not entitled to any sort of damages. The district court declined to subclass the authors and approved a settlement involving all three categories. The Circuit held that the three categories were "fundamentally" in conflict as to the distribution of a settlement because their claims commanded different settlement values. As the court pointed out, "[n]amed plaintiffs who hold [claims outside Category C] had no incentive to maximize the recovery for Category C-only plaintiffs." 654 F.3d at 254.

In re Forcefield Energy Inc. Securities Litigation, Not Reported in F.Supp.3d (2015)

2015 WL 4476345, Fed. Sec. L. Rep. P 98,580

Here, Ling argues that the equity and bond claims differ because stock and bond prices are affected differently by market news. Furthermore, according to Ling, the equity claims are far more valuable that the bond claims because only equity-holders, whose securities were publicly traded, may rely on the fraud-on-the-market theory of reliance.

It is true in the abstract that stock and bond prices can be affected in different ways by market news. For example, sudden news of increased economic growth will tend to raise stock prices due to the expectation of greater profits, but will tend to cut bond prices due to the expectation that households and businesses will be more willing to take loans at higher yields. *Cf. In re Countrywide Fin. Corp. Sec. Litig.,* 273 F.R.D. 586, 615 (C.D.Cal.2009) ("[G]enerally increasing interest rates will increase bond yields."). Bad news about a specific business may affect equity prices drastically and bond prices minimally if, even after accounting for the bad news, the company remains far from insolvency. *See id.* (discussing the concept of an " 'cushion' for bad news").

**\*6** However, a single company's stock price and bond price are not completely independent. When, as plaintiffs allege here, the truth about a company is so devastating that the company's stock price falls close to zero, it is reasonable to expect that the same information will cause a significant decrease in the value of the company's corporate bonds. It is likely, then, that the equity-holders and note-holders will share exactly the same objectives: proof that defendants lied, proof that defendants' misrepresentations artificially propped up ForceField's stock and bond prices, and recovery (with pro rata distribution) of their investment losses.

Ling also argues that the note-holders have legally weak claims because, in the absence of a developed market for ForceField bonds, the note-holders cannot utilize the fraud-on-the-market theory of reliance. We do not know whether Ling is factually correct that the market for ForceField bonds was inefficient. But even if this were so, then the proper remedy would be to deny the note-holders class certification and allow the largest equity-holder (i.e., Brewer) to act as lead plaintiff for the equity-holders. The difficulties of subclassing come into play only when, as in *Literary Works,* both categories of class members remain in the case.

Finally, the present situation is easily distinguishable from *Literary Works.* In *Literary Works,* the Circuit's concern was that a lead plaintiff with two types of claim would focus his energies on maximizing the returns for the more valuable type of claim, to the detriment of class members who held the less valuable type. Here, Ling argues that Brewer might inadequately advance the equity claims. This concern is misplaced because Brewer's equity-based claims are monetarily larger and legally stronger than her debt-based claims.[13]

13    If anything, Brewer might be expected to advance her equity claims at the expense of debtholders. It would be premature to address this concern now, before any debt-only class member has sought subclassing and before final certification.

### 4. Conclusion

Movant Brewer suffered the greatest loss of any movant, and is presumptively the most adequate plaintiff. Her claims are typical of the class's, she appears adequate to represent the entire class, and there is no evidence at this stage that she will be subject to special defenses. Accordingly, we appoint Brewer to be lead plaintiff.

### C. Class Counsel

The PSLRA "evidences a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection and counsel retention." *In re Adelphia Commc'ns Corp. Sec. & Deriv. Liab. Litig.,* No. 03–md–1529 (LMM), 2008 WL 4128702, at \*2, 2008 U.S. Dist. LEXIS 67220, at \*14 (S.D.N.Y. Sept. 3, 2008) (quoting *In re Cendant Corp. Litig.,* 264 F.3d 201, 276 (3d Cir.2001)).

In this litigation, the Rosen Law Firm, P.A. ("Rosen"), filed the first class complaint just two days after the *Seeking Alpha* article and now represents the lead plaintiff. Rosen's résumé (Brewer Mem., Ex. 4, ECF No. 7) demonstrates that Rosen has sufficient experience on behalf of securities fraud plaintiffs to represent the putative class at this stage. Rosen shall therefore be designated as interim counsel for Brewer's putative class.

### *CONCLUSION*

**\*7** Beverly Brewer is appointed as lead plaintiff and the Rosen Law Firm, P.A., is appointed as interim counsel in

2015 WL 4476345, Fed. Sec. L. Rep. P 98,580

the above-captioned cases, which are consolidated as *In re ForceField Energy Inc. Securities Litigation,* No. 15 Civ. 3020(NRB). Brewer shall file a complaint reflecting her appointment within 30 days, and shall promptly inform the Judicial Panel on Multidistrict Litigation of this Memorandum and Order. The service of Brewer's complaint and the filing of subsequent pleadings shall then proceed according to the Federal Rules of Civil Procedure, the Local Rules of this Court, and our Individual Practices.

The Clerk of Court is directed to close all open motions in the above-captioned cases and to terminate all plaintiffs and movants other than Beverly Brewer.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4476345, Fed. Sec. L. Rep. P 98,580

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.